## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | | |
|---|---|---|
| **RONALD BELL,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **5:04-CV-390 (DF)** |
| | : | |
| **HOUSTON COUNTY, GEORGIA;** | : | |
| **CULLEN TALTON, Sheriff of** | : | |
| **Houston County, in his individual** | : | |
| **and official capacities; and** | : | |
| **WINFRED WILLIAMS, Deputy** | : | |
| **Sheriff of Houston County, in his** | : | |
| **individual and official capacities,** | : | |
| | : | |
| **Defendants.** | : | |

## O R D E R

This is a civil rights action arising out of Ronald Bell's temporary detention in a county jail.  On October 14, 2004, Bell brought suit in the Superior Court of Houston County, Georgia, against (1) Houston County, (2) Houston County Sheriff Cullen Talton, and (3) Houston County jail officer Winfred Williams, alleging federal and state constitutional violations, and state-law claims for malicious prosecution, false imprisonment, negligent hiring and retention, and intentional infliction of emotional distress.  On the basis of the complaint's federal claims—which allege violations of the Fourth, Fifth, Sixth, and Fourteenth Amendments (Equal Protection

and Due Process)[1]—Defendants removed Bell's suit to this Court under 28 U.S.C.A. § 1441, invoking jurisdiction under 28 U.S.C.A. § 1331.  Defendants have now moved for summary judgment on all of Bell's claims, both federal and state.  After thorough consideration of the evidence in the light most favorable to Bell, and for the reasons set forth below, the Court grants Defendants' motion for summary judgment (doc. 14) as to the federal claims and remands the state-law claims to the Superior Court of Houston County.

## I.  BACKGROUND

On October 21, 2002, shortly before midnight, Ronald Lee Bell came home from work, drank a couple of beers, and got into an argument with his girlfriend, Exie Strozier.  (Bell Dep., doc. 17, at 50:16-18.)  Strozier had returned home later than Bell had that night, and the argument ensued when Bell began questioning her about where she had been.  (*Id.* at 53:2-4.)  As the argument escalated, Strozier called the local authorities and requested that someone come to the scene.  (*Id.* at 5-6.)  At the

---

[1] This Court will treat Bell's federal constitutional claims as claims being pursued under 42 U.S.C.A. § 1983, even though that statute is nowhere mentioned in his complaint.  For future reference, however, Bell's counsel should be forewarned that, in a suit alleging federal constitutional claims against non-federal government officials, "[w]hen Congress has provided an adequate alternative remedial scheme [i.e. § 1983], which is intended to be a substitute for direct recovery under the constitution, a Bivens-type action [in which causes of action are implied directly from the constitution itself] is inappropriate." ***Williams v. Bennett***, 689 F.2d 1370, 1390 (11th Cir. 1982).  Because § 1983 is also the vehicle through which a plaintiff must pursue federal constitutional claims in state court, *see, e.g.*, ***Poss v. City of North Augusta***, 424 S.E.2d 73, 74 (Ga. Ct. App. 1992), it is not clear why the statute was not invoked in Bell's complaint.

time of the incident, Bell was living with Strozier and Strozier's three daughters in Strozier's double-wide trailer in Houston County, Georgia.  (*Id*. at 7:18-24.)

Glenn Goodman, a Houston County Deputy Sheriff, showed up in response to Strozier's call.  (Goodman Decl. ¶ 2,  Ex. 2 to Defs.' Mot. Summ. J., doc. 14.)  It is unclear how many officers responded to the scene, but there were a total of three patrol cars present by the time all was said and done.[2]  (Bell Dep., doc. 17, at 57:7-11.)  Upon his arrival, Goodman briefly questioned Bell and Strozier about the incident and, after informing Bell that there were no grounds for arresting anyone, walked out of the trailer to his patrol car to leave.  (*Id*. at 56:22-24.)  One of Strozier's daughters who was home at the time, LaRhonda, followed Goodman out of the trailer and, according to Bell, "said something to the police."  (*Id*. at 54:23-24.)  It is unknown what LaRhonda said to the officers, but soon thereafter, Goodman came back inside the trailer and arrested Bell for "simple assault."  (*Id*. at 58:13-17, 20.)

Goodman handcuffed Bell and took him to a jail facility in Warner Robins, known among the law enforcement community as the North End Jail, where arrestees are temporarily housed and processed before being transferred to the county jail in Perry.  (Goodman Decl. ¶ 2,  Ex. 2 to Defs.' Mot. Summ. J., doc. 14; Williams Dep.

---

[2] Neither Defendant Talton nor Defendant Williams were present at Strozier's residence on the night of October 21.  (Bell Dep., doc. 17, at 58:2-6).

at 13:7-16, Ex. 8 to Defs.' Mot. Summ. J., doc. 14.)  Bell was placed in a holding cell, where he was detained for approximately twenty minutes before being summoned by Defendant Winfred Williams, a booking officer with the Monroe County Sheriff's Office.  (Bell Dep., doc. 17, at 62:23; 63:3, 25.)  Besides Goodman, the only officer Bell had contact with at the jail that night was Williams, who happened to be the only jail officer on duty at the time.  (*Id*. at 64:3-8.)

Williams, who according to Bell was "acting really mean . . . like he had something to prove because he was a police officer," (*Id*. at 70:15-16), asked Bell a series of typical booking questions (name, address, age, date of birth, etc.) and then, according to Bell, asked him if he had insurance.  (*Id*. at 65:3-4, 7; 66:12.)  Bell responded that he did have insurance, and Williams suddenly got "highly upset," told Bell he was "tired of messing with [him]," took him back to a makeshift holding cell, and left him there for approximately two and a half hours.[3]  (*Id*. at 65:7-9, 12.)  Williams eventually returned for Bell, took him back to the booking area, and continued to ask him questions.  (*Id*. at 69:13-18.)  The second round of questioning passed without incident.  (*Id*. at 72:2-5.)

As part of the paperwork associated with the booking process, Williams filled

---

[3] Williams paints quite a different picture of his interaction with Bell, saying it was Bell who was acting "defiant," "sarcastic," and generally "not [ ] cooperative" with Williams's questions. (Williams Dep., Ex. 8 to Defs.' Mot. Summ. J., doc 14, at 27:15-16, 19, 20.)

out an inmate risk-assessment form.  (Williams Dep., Ex. 8 to Defs.' Mot. Summ. J.,
doc. 14, at 8:18-20.)  The information used to determine Bell's level of risk came
from his past criminal history, as reflected in the database maintained by the Georgia
Crime Information Center (GCIC).  (*Id.* at 17:12-14.)   Williams entered this
information on the risk-assessment form.   Bell maintains that the information
Williams entered on the form (indicating past charges for murder and manslaughter)
was false, thereby inaccurately representing his past criminal history and causing him
mental distress.  (Bell Dep., doc. 17, at 74:25; 80:12-17; 90:4-6.)

Upon Bell's arrival at the North End Jail, Williams was given a Booking
Information Sheet that Deputy Goodman had filled out.  That sheet listed the charge
for which Bell had been arrested (family violence–simple assault) and a charge that
directly resulted from that arrest (V.O.P.–violation of probation).[4]  Below the simple
assault and V.O.P. charges, next to a box labeled "WARRANT #," Goodman had
written "TBT," which indicated to Williams that a warrant was "to be taken" for both
charges.  (Goodman Decl. ¶ 6, Ex. 2 to Defs.' Mot. Summ. J., doc. 14.)  Also below
the V.O.P. charge, next to a box labeled "HOLDS," Goodman had written "YES,"
indicating to Williams that Bell was to be held in custody "pending a decision by his

---

[4] At the time he was arrested, Bell was serving a term of probation for a previous DUI conviction, according to his probation officer, Bridget Standring.  (Standring Dep., doc. 18, at 10:9-11.)

probation officer."  (*Id.* ¶ 7.)

At some point after Bell was brought in and booked, Williams attempted to contact Bell's probation officer, with no success.  (Williams Dep., Ex. 8 to Defs.' Mot. Summ. J., doc. 14, at 24:18-20.)  Once the booking process was completed, Bell was transported to the main county jail in Perry.  (Bell Dep., doc. 17, at 90:6-9.)

After being moved to the county jail, on the morning of October 22, Bell had his initial appearance in front of a magistrate judge in Perry.  (Bell Dep., doc. 17, at 94:19-25.)  At the hearing, Bell learned there was a probation hold on him, the judge denied him bond because an arrest warrant was being pursued on the V.O.P. charge,[5] and Bell was ordered remanded to custody.  (*Id.* at 95-19-22; First Appearance Form, Ex. 6 to Defs.' Mot. Summ. J., doc. 14.)  That same day, Bell's arresting officer, Goodman, secured from a magistrate judge an arrest warrant against Bell on the charge of simple assault.  (Ex. B to Goodman Decl., doc. 14.)  Goodman tried to contact Bell's probation officer, Bridget Standring, with that information, to no avail.  (Goodman Decl., Ex. 2 to Defs.' Mot. Summ. J., doc. 14.)  Several days passed before Standring found out about Bell's arrest and detention.  When she was ultimately

---

[5] On the First Appearance Form filled out by the magistrate judge, on the line indicating the reason why bond was denied, are the handwritten letters "WTBT," which, based on Goodman's declaration, the Court presumes to mean "warrant to be taken."  (First Appearance Form, Ex. 6 to Defs.' Mot. Summ. J., doc. 14.)

informed of the situation by someone at the jail facility, she told the jail staff that she would not authorize a release of the probation hold because she had not requested it in the first place. (Standring Dep., doc. 18, at 25:1-3.)

Bell next appeared before a judge for a bond hearing on October 31, at which time his bond was set at $2,500.00. (Bell Dep., doc. 17 at 99:3.) Following that hearing, Bell says the jail authorities told him he could not be released yet because "they didn't have nobody to come over and cash [his] check." (*Id*. at 99:15-16.) Bell eventually obtained the assistance of AAA Bonding, which posted his bond, thereby securing his release from custody on November 4, 2002. (*Id*. at 98:20-23.)

At the time of his arrest, Bell had two jobs. He worked for a temporary-employment agency called Image Staffing, which had recently assigned him to perform services as a maintenance technician at a local apartment complex. (*Id*. at 17:15-17; 20:7-9.) He also worked part-time in the evenings for Bass Janitorial Services, cleaning the floors of various buildings at Warner Robins Air Force Base. (*Id*. at 22:18-20; 23:12-13; 25:12-17.) Following his stint at the county jail, Bell was informed by both Image Staffing and Bass Janitorial that he had been released for missing too much work. (*Id*. at 18:6-9; 19:7-8; 23:9-12.)

Bell filed this lawsuit on October 14, 2004, alleging that his federal and state constitutional rights were violated: (1) when Williams reported in Bell's booking

-7-

records erroneous information about his past criminal history; and (2) when Williams put a "probation hold" on him "without authorization from the Probation Department or order of the Court." (Compl. ¶ 13.)  Bell alleges that Williams's actions deprived him of his ability to post bond and unlawfully prolonged his incarceration, thereby violating his rights under the Fourth, Fifth, and Sixth Amendments, and the Equal Protection and Due Process Clauses of the Fourteenth Amendment.  (Compl. ¶ 39.) He also alleges a number of tort claims arising under Georgia law.  (Compl. ¶¶ 18-36.)

Based on Williams's actions in administering the jail's inmate-intake policy (specifically the portion regarding probation holds), Bell seeks to hold liable Houston County, Sheriff Talton, and Williams; Bell has sued Talton and Williams in their individual and official capacities.  Bell also alleges that Talton and Williams "engaged in a scheme and conspiracy" to deprive him of his constitutional rights.[6] (Compl. ¶ 40.)

Defendants have moved for summary judgment on all claims.

---

[6] This allegation is so baseless as to warrant no further discussion.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also **Celotex Corp. v. Catrett***, 477 U.S. 317, 322 (1986).  A genuine issue of material fact necessary to defeat a properly supported motion for summary judgment arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 248 (1986).  The Court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but may not make credibility determinations or weigh the evidence.  ***Id.*** at 249.  Finally, "the evidence presented cannot consist of conclusory allegations or legal conclusions."  ***Avirgan v. Hull***, 932 F.2d 1572, 1577 (11th Cir. 1991).

## III.  DISCUSSION

As a preliminary matter, the Court notes that the allegations in Bell's complaint do not state a claim for relief under the Fourth, Fifth, or Sixth Amendments or the Equal Protection Clause of the Fourteenth Amendment.  Accordingly, Defendants are entitled to judgment as a matter of law on those claims.

The Fourth Amendment has no application to this case because no search was

conducted and because Bell does not challenge any aspect of his arrest or initial seizure.  *See **Jones v. City of Jackson***, 203 F.3d 875, 880 (5th Cir. 2000) ("Fourth Amendment claims are appropriate [only] when the complaint contests the method or basis of the arrest and seizure of the person.  The protections offered by the Fourth Amendment do not apply if the plaintiff challenges only continued incarceration.") (internal citations omitted).  The Due Process Clause of the Fifth Amendment (as distinguished from its Fourteenth Amendment analogue) has no application to this case because that Clause serves as a limitation on the power of the federal government only, and the allegations in Bell's complaint do not in any way implicate the federal government.  *See **Rivera v. Allin***, 144 F.3d 719, 726 (11th Cir. 1998) ("The Fifth Amendment prohibits the *federal government* from depriving a person of 'life, liberty, or property, without due process of law.'") (emphasis added).  The Sixth Amendment, on the basis of the facts alleged in Bell's complaint, likewise has no application to this case.  *See **Peoples v. Campbell***, 377 F.3d 1208, 1223 n.30 (11th Cir. 2004).  And finally, the Equal Protection Clause of the Fourteenth Amendment has no application to this case because Bell has not alleged, and has not made an attempt to prove, that any of the defendants intentionally discriminated against him by treating him disparately in comparison to any other similarly situated person.  *See* ***Thigpen v. Bibb County***, 223 F.3d 1231, 1237 (11th Cir. 2000), *abrogated on other*

-10-

grounds by *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002); *see also*

*Missouri v. Jenkins*, 515 U.S. 70, 121 (1995).  That leaves Bell's Fourteenth

Amendment Due Process Claim as the sole remaining federal claim in this lawsuit.

## A.     The Due Process Clause of the Fourteenth Amendment

Because the constitutional harm that Bell allegedly suffered occurred while he

was a pretrial detainee, being held on an assault charge and a charge of violating the

terms of his probation, the Due Process Clause of the Fourteenth Amendment governs

his claim.  *See Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 n.4 (11th Cir. 1995)

("Because [plaintiff] was a detainee and not a prisoner, however, his constitutional

rights arise not from the Eighth Amendment, but from the Due Process Clause of the

Fourteenth Amendment."); *see also Hamm v. DeKalb County*, 774 F.2d 1567, 1572

(11th Cir. 1985) ("Conditions of confinement imposed prior to conviction are limited

[ ] by the due process clause of the fourteenth amendment.").

The Fourteenth Amendment prohibits a state from depriving any individual of

his or her liberty "without due process of law."  U.S. Const. amend IV.  The Due

Process Clause guarantees more than fair process; it "cover[s] a substantive sphere

as well." *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998).  Regardless of

whether a particular claim implicates the Clause's procedural or substantive sphere

of coverage, "[t]he touchstone of due process is protection of the individual against

arbitrary action of government." *Id.* at 845 (citation omitted).  In cases involving a substantive claim like Bell's—an allegation of abusive executive action—"only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Id.* at 846 (citation omitted).  Under the Due Process Clause, a state official is not subject to liability for his or her actions unless the arbitrariness of those actions can be said to "shock[ ] the conscience." *Id.*  In explaining this somewhat-amorphous standard of conduct, the Supreme Court has said that "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* at 849.  With that background in mind, the Court turns now to Bell's due process claim.

To put it mildly, Bell's brief in response to Defendants' summary-judgment motion is no model of clarity.  Bell's muddled presentation makes it somewhat difficult to discern the precise nature of the due process right he claims was violated. That is unfortunate because "in any action under § 1983, the first step is to identify the exact contours of the underlying right said to have been violated." *Id.* at 842 n.5. The sum and substance of his argument in support of his due process claim is this:

> Deputy Winfred Williams intentionally placed a probation hold on Ronald Bell.  As a result of Deputy Williams' conduct, Bell could not be released from jail and suffered adverse consequences including loss of his employment.

(Pl.'s Br. Opp'n Defs.' Mot. Summ. J., doc. 22, at 15) (record citations omitted).[7] That is it.  That is the whole argument.  Those two sentences, placed under the heading "DEFENDANT WILLIAMS CONDUCT VIOLATED PLAINTIFF BELL'S FOURTEENTH AMENDMENT RIGHT," constitute the entire basis for Bell's due process claim.

For that conduct, Williams has been sued in his individual and official capacity. So too has Sheriff Talton, who Bell asserts can be held vicariously liable for Williams's allegedly inappropriate conduct.  Bell has also sued Houston County, presumably claiming municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

The Court will analyze Bell's due process claim in three parts.  First, the Court will address the claim as asserted against Williams and Talton in their individual capacities.  Second, the Court will address the claim as asserted against Williams and Talton in their official capacities.  Third, the Court will address the claim as asserted against Houston County.

---

[7] Bell alleged in his complaint that his incarceration was also unlawfully prolonged because Williams "intentionally . . . placed several false crimes older than five years"—namely murder and manslaughter charges—in his risk-assessment form.  (Compl. ¶¶ 13, 19, 37.)  Bell no longer makes that contention.  Bell conceded in his deposition that the information contained in the criminal-history portion of his risk-assessment form did not lengthen his incarceration beyond what it would otherwise have been absent that information. (Bell Dep., doc. 17, at 122:12-17; 123:1-8.)  And in any event, Bell has produced no evidence to demonstrate that Williams purposely attributed to him crimes that he knew Bell had not committed.  The evidence shows that Williams simply included in Bell's criminal-history report information yielded by a search of the GCIC database.  Bell now maintains that his incarceration was unconstitutionally prolonged solely because of the "probation hold" entered in his booking records.  (*Id*. at 123:13-16.)

1.      **Individual-Capacity Claims**

a.      **Qualified Immunity**

i.      **Williams**

Williams asserts that he is entitled to qualified immunity with regard to Bell's

due process claim. (Defs.' Br. Supp. Mot. Summ. J., doc. 14, at 2.) More than simply

an affirmative defense, qualified immunity is a freedom from suit that offers

"complete protection for government officials sued in their individual capacities as

long as their conduct violates no clearly established statutory or constitutional rights

of which a reasonable person would have known." *Lee v. Ferraro*, 284 F.3d 1188,

1193-94 (11th Cir. 2002) (internal quotations omitted). The purpose of qualified

immunity "is to allow government officials to carry out their discretionary duties

without the fear of personal liability or harassing litigation." *Id.* at 1194. Its

protection extends to "all but the plainly incompetent or those who knowingly violate

the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Before becoming eligible for qualified immunity, a government official must

show that he was engaged in a "discretionary function" when he performed the act

of which the plaintiff complains. *Holloman ex rel. Holloman v. Harland*, 370 F.3d

1252, 1263-64 (11th Cir. 2004) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982)). Here, Williams was unquestionably performing a discretionary function

-14-

when he booked Bell into the North End Jail.  *See Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994) (defining discretionary functions as those "undertaken pursuant to the performance of [the official's] duties" and "within the scope of his authority"). Williams is therefore entitled to assert the protection of qualified immunity.

Once qualified immunity is properly invoked, "the burden shifts to the plaintiff to show that the defendant is not entitled to" its protection.  *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003).  To overcome an assertion of qualified immunity, the plaintiff must show that: "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Holloman*, 370 F.3d at 1264; *see Conn v. Gabbert*, 526 U.S. 286, 290 (1999).  In making this showing, the plaintiff must bear in mind that "a defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated.  Evidence concerning the defendant's subjective intent is simply irrelevant to that defense." *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998).

The Court must evaluate the evidence in the light most favorable to the party asserting the injury.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The second requirement—that the official must have violated a "clearly established" right of the plaintiff—comes into play only "[i]f a constitutional right would have been violated under the *plaintiff's* version of the facts." *Ferraro*, 284 F.3d at 1194; *see, e.g.,*

-15-

*Harris v. Coweta County*, 406 F.3d 1307, 1313 (11th Cir. 2005) ("If, assuming the plaintiff's allegations were true, no [constitutional] right would have been violated, the analysis is complete."). Accordingly, the Court will first address whether Williams's actions violated Bell's due process rights.

<u>Constitutional Violation</u>

Bell's booking and temporary detention were at all times in compliance with Georgia law and with the written policy governing inmate-intake procedures at the Houston County Jail.[8] Bell has proffered no evidence to suggest that any aspect of his booking or detention was carried out by Williams in a manner that shocks the conscience. In fact, in view of the allegations in Bell's complaint and the record before the Court, the assertion that Williams did anything to shock anyone's conscience—or that his actions came even remotely close—is frivolous. The Court will first restate the relevant facts and will then set forth the controlling Georgia law and the applicable provisions of the jail's inmate-intake policy.

<u>Relevant Facts</u>

Bell was arrested by Deputy Goodman on the night in question for assaulting his girlfriend. (Goodman Decl. ¶¶ 4-7.) Following the arrest, Goodman filled out a

---

[8] Bell does not challenge the constitutionality, on due process grounds or otherwise, of jail policy itself or of any of the applicable Georgia statutes.

Booking Information Sheet, on which he recorded two charges against Bell—one for the assault and the other for violating the term of his probation that forbid him from breaking the law.  (Ex. A to Goodman Decl.)  Goodman indicated on the sheet that arrest warrants were to be taken out on both charges and that Bell was subject to a "hold" until some action could be taken on his V.O.P. charge.  (*Id.*)  Goodman provided the booking sheet to Williams, the only booking officer on duty at the North End Jail on the night in question.  (Goodman Decl. ¶ 8.)

Several hours later, following the completion of the booking paperwork, Bell was taken before a magistrate judge for his initial appearance.  The magistrate judge denied bond and remanded Bell to custody.  On the First Appearance Form filled out by the magistrate judge, there appears a handwritten notation indicating that Bell was denied bond because of his status as a probationer and because a warrant was to be taken out for the charges.  In other words, the magistrate judge ordered that Bell remain detained until such time as a revocation hearing could be held on the charges pending against him or until such time as a judge determined that Bell was not a danger to the community and was otherwise entitled to bond.

Later that same day, Goodman applied for and obtained from a state magistrate judge an arrest warrant charging Bell with "SIMPLE ASSAULT – DOMESTIC." (Ex. B to Goodman Decl.)  The arrest warrant's issuance was based on a probable-

cause determination by the magistrate judge that Bell had committed the assault for which he had been arrested and charged.  (*Id.*)  The arrest warrant also necessarily operated as a determination, based on probable cause, that Bell had violated a condition of his probation; specifically, the general condition commanding that he "not violate the laws of any governmental unit."  (Ex. 2 to Standring Dep., doc. 18; Standring Dep., doc. 18, at 13:13-15.)

A bond hearing was held on October 31.  At that hearing, the judge set Bell's bond at $2,500.00.  Bell was unable to make adequate bond arrangements with the jail until he obtained the assistance of AAA Bonding, which posted his bond on November 4.  Bell was immediately released from jail.

### Georgia Law

As a general rule, under Georgia law, a probationer who has been arrested and who is suspected of having violated the terms of his probation is brought before a court of competent jurisdiction, and that court "may commit him or release him *with or without bail* to await further hearing or it may dismiss the charge."  O.C.G.A. § 42-8-38(b) (Lexis 1997) (emphasis added).[9]  Depending on the type of crime with which

---

[9] Following a warrantless arrest, the supervising probation officer or other arresting officer must procure a warrant from an appropriate judicial officer within 48 hours of the arrest, or the probationer-arrestee must be released from custody.  O.C.G.A. § 17-4-62; 1981 Op. Att'y Gen. No. U88-14.  In this case, Goodman, the arresting officer, procured a warrant from a magistrate judge on the charge of simple assault within 24 hours of Bell's arrest.  (Ex. B to Goodman Decl.)

the probationer has been charged, however, that general rule is subject to an important—and in this case crucial—qualification: "[A] probationer charged with a misdemeanor involving . . . an attempt to commit physical injury . . . *shall not* be entitled to bond pending a hearing on the revocation of his or her . . . probation, *except by order of a judge* [superior, state, or magistrate] . . . *after a hearing* and *upon determination* of the [judge] that the . . . probationer *does not constitute a threat to the community*." O.C.G.A. § 17-10-1 (Lexis 2004 & Supp. 2005). In this case, Bell was charged with "an attempt to commit physical injury," and at the time the magistrate judge denied Bell bond and remanded him to custody (1) warrants were to be taken out on both the assault charge and the V.O.P. charge, (2) no revocation hearing had yet been held, and (3) no judge had made a determination that Bell did not constitute a threat to the community. Therefore, under O.C.G.A. § 17-10-1, Bell was not entitled to bond, and the "hold" on him was lawful.

<u>Houston County Detention Facility Policy</u>

The booking procedures at issue in this case are governed by a written policy promulgated and enforced by Sheriff Talton. (Talton Decl. ¶ 6; Ex. A to Talton Decl., "Houston County Detention Facility Policy and Procedure Manual")  That policy governs "Houston County sheriff's deputies in regard to detention of probationers and establishment of bonds" and was "in force . . . over the duration of October and

November 2002." (*Id.*)

According to the jail policy, "No hold will be granted without sufficient reason." (Ex. A to Talton Decl.) Among the reasons deemed sufficient by the policy itself are those situations in which there is a "Warrant to be taken" or an "On going investigation/charges pending." (*Id.*) When an arrestee is found to be on probation, jailers are instructed to call the arrestee's probation officer to "ask if they want to place a hold on the inmate." (*Id.*) But "[i]f the subject is arrested and/or brought to the facility after 2200 hours, a hold for probation [ ] *will be placed on the subject* and the Shift Commander will be notified." (*Id.*)[10]  The appropriate jail official is instructed to "notify the subject's probation [ ] officer for the need of the disposition of the hold." (*Id.*)

It is undisputed that Bell was brought to the North End Jail after 2200 hours (10:00 p.m.)[11]  Because the Jail Booking Sheet indicated that warrants were to be taken out against Bell for assault and for violating his probation (sufficient reasons for placing a hold), and because he was brought to the jail after 2200 hours, a hold was automatically placed on him, in keeping with the jail policy.  The following day,

---

[10] The placement of a hold under these circumstances is mandated by the policy, and, hence, not subject to the discretion of an individual jailer.

[11] The Booking Information Sheet filled out by Deputy Goodman lists the time of arrest at "0208"—or 2:08 a.m.

Williams and Goodman both attempted to contact Bell's probation officer to tell her of the hold, but she could not be reached.

The jail policy further states the general rule that "[u]nder no circumstances is a person incarcerated for a misdemeanor to have bond denied, except as stated in list [sic] found in section I & J of this policy." (*Id.*)  Section I of the policy provides one exception to the general rule, stating: "Inmates charged with a person on person crime (i.e. Battery) will not be bonded until the first appearance hearing has been conducted or until a magistrate judge has set bond." (*Id.*)  Section J, another exception, which is in substance a restatement of O.C.G.A. § 17-10-1, states that a probationer charged with an attempt to commit physical injury

> shall not be entitled to bond pending a hearing on the revocation of his or her [ ] probation.  Exception being *by order of a Superior Court judge*, wherein the alleged new offense occurred *after a hearing* and *upon determination* of the Superior court that the [ ] probationer *does not constitute a threat to the community*.

(*Id.*)  As noted above, at the time Bell was brought to the North End Jail, he fit both exceptions to the general rule prohibiting the denial of bond for those charged with misdemeanors:  He was charged with a person on person crime (assault), and he was a probationer charged with a crime involving an attempt to commit physical injury (assault).  With regard to the latter exception, set forth in section J of the jail policy, it is undisputed that at the time Bell was denied bond there had been no hearing in

front of a Superior Court judge and no determination by such a judge that Bell was not a danger to the community. Thus his denial of bond was appropriate, and he was properly subject to a probation hold.

Quite apart from the propriety of the hold itself, the Court notes that there is significant disagreement in this case about *who* placed Bell under a "probation hold" and about who is authorized to do so under Georgia law. Bell alleges in his complaint, and maintains in his summary-judgment opposition brief, that Williams caused the probation hold to be issued. (Compl. ¶ 13) ("Williams intentionally placed a probation hold on Mr. Bell without authorization from the Probation Department or order of the Court."); (Pl.'s Br. Opp'n Defs.' Mot. Summ. J., doc. 22, at 15) ("Williams intentionally placed a probation hold on Ronald Bell.") Williams argues that Goodman is responsible for causing the "probation hold" to be issued because Goodman, not Williams, was the one who filled out the Booking Information Sheet and wrote "YES" in the box labeled "HOLDS" under the charge "V.O.P." (violation of probation). (Defs.' Br. Supp. Mot. Summ. J., doc. 14, at 7.) Standring, Bell's probation officer, does not pin responsibility on anyone in particular other than to say that she did not request the hold. Moreover, Standring testified that, under Georgia law, a probation officer is the only individual authorized to request that a probation hold be placed on a probationer who has been arrested on a suspicion of having

violated the terms of his probation.  (Standring Dep., doc. 18, at 25:12-17) ("I informed [the jail official] that technically by law they cannot [place a hold].  They are not the supervising officer.  The only person who can place a hold on that defendant would be . . . the probation agency that was supervising him.")  Standring did not support that belief by reference to a particular provision of Georgia law (statutory, regulatory, or otherwise), but she said she learned it during a two-week training course for new probation officers.

If the Court understands Bell's position, then, the gravamen of his grievance appears to be not that his rights were violated when he was held without bond, but that Williams deprived him of his due process rights by denying him bond without first getting authorization from a judge or from Bell's probation officer.  (Compl. ¶ 13) ("Winfred Williams intentionally placed a probation hold on Mr. Bell *without authorization from the Probation Department or order of the Court*.")  Bell calls the probation hold "false" and alleges that Williams performed his booking function "negligently, improperly, corruptly, and unskillfully."  (Compl. ¶ 17.)

There are a number of things wrong with this position.  Not least among them is that, even if Bell's argument were based on a correct understanding of Georgia law or the jail policy (which it is not), and even if Bell could establish a violation of either one (which he cannot), Williams's conduct in this case was not "arbitrary in the

constitutional sense," *Lewis*, 523 U.S. at 846, does not "shock[ ] the conscience," *id.*, and thus did not violate the Due Process Clause.[12]  Because Williams did not violate Bell's constitutional rights, Williams is entitled to qualified immunity on Bell's due process claim.

### ii.    Sheriff Talton

Talton asserts that he is entitled to qualified immunity with regard to Bell's due process claim.  (Defs.' Br. Supp. Mot. Summ. J., doc. 14, at 2.)  From Bell's complaint, it is clear that he seeks to hold Sheriff Talton vicariously liable for the constitutional deprivation allegedly occasioned by Williams's actions. (Compl. ¶ 27) ("Houston County Sheriff [is] *vicariously liable* for the acts of [his] employee that ultimately led to [the harms alleged]."); (Compl. ¶ 39) (alleging that Bell was deprived of his constitutional rights by "the actions of Defendants . . . *through the agency of* its authorized police officer [Williams].")

Vicarious liability, however, is not a proper basis for liability under § 1983.

---

[12] The more glaring problem with Bell's allegation is that it is demonstrably false.  The initial hold placed on Bell was automatic and mandatory under the jail policy.  (Ex. A to Talton Decl.) ("If the subject is arrested and/or brought to the facility after 2200 hours, a hold for probation [ ] *will be placed on the subject*. . . .")  Williams needed permission from no one to hold Bell overnight until such time as an initial appearance could be held.  The following morning, at his initial appearance, the magistrate judge authorized Bell's "hold" to remain in place because a warrant was going to be obtained on the assault charge (a charge which would also constitute a probation violation).  That hold would remain in place until such time as a judge could conduct a bond hearing to determine whether Bell was a danger to the community. O.C.G.A. § 17-10-1. So Bell's contention that he was subject to a hold unauthorized by a judge is not true.

"'It is axiomatic, in section 1983 actions, that liability must be based on something more than a theory of respondeat superior.'" *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990) (quoting *H.C. ex rel. Hewett v. Jarrard*, 786 F.2d 1080, 1086 (11th Cir. 1986)). "Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation." *Id.* "The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *Id.*

Bell has not alleged, and does not in opposition to summary judgment contend, that Talton was personally involved in his booking at the North End Jail or in any other decision to hold him without bond pending the resolution of his probation-violation charge. Bell conceded during his deposition that Talton did not have "any personal involvement in [his] arrest or incarceration at any time between October 21st, 2002 and November 4th, 2002." (Bell Dep., doc. 17, at 103:4-7.)

Likewise, Bell has proffered no evidence that Talton failed to cure an alleged constitutional deprivation in the face of "a history of widespread abuses." *Brown*, 906 F.2d at 671.

Because Bell's due process claim against Sheriff Talton is based on nothing

-25-

more than a theory of respondeat superior—an impermissible theory of liability under § 1983—that claim must fail as a matter of law, thus entitling Sheriff Talton to summary judgment.

### 2.    Official-Capacity Claims

Bell has sued both Talton and Williams in their official capacities.  For the reasons explained below, Talton and Williams are entitled to summary judgment on these claims.

### a.    Talton

Talton argues that he—as the elected Sheriff of Houston County—acts as an "arm of the State" for the particular law enforcement functions at issue in this case, namely, "policymaking with respect to pretrial detention procedures and classification at the Houston County Jail."  (Defs.' Mot. Summ. J., doc. 14, at 15.)  Talton thus argues that summary judgment in his favor is appropriate because he is entitled to sovereign immunity under the Eleventh Amendment.  The Court agrees that Talton is entitled to summary judgment on the official-capacity claim against him.  But the Court's conclusion is not dependent on Eleventh Amendment immunity; instead, the Court concludes that Talton is an "arm of the state" and that, as such, he is not a "person" capable of being sued under § 1983.

An official-capacity claim against a defendant governmental officer is in

essence a claim against the governmental entity the officer represents—that is, the "entity of which an officer is an agent." ***Kentucky v. Graham***, 473 U.S. 159, 165 (1985) (citation omitted).   In determining which entity a county sheriff represents—the State or his particular county—"the question is not whether [the sheriff] acts for [the state] or [the county] in some categorical, 'all or nothing' manner," but instead, whether the sheriff acts for the state "in a particular area, or on a particular issue." ***McMillian v. Monroe County***, 520 U.S. 781, 785 (1997).  So if, in performing a particular function, a sheriff represents the State (as opposed to the county), an official-capacity claim against him will be treated as one against the State itself.

In ***Manders v. Lee***, 338 F.3d 1304, 1304-05 (11th Cir. 2003) (en banc), the Eleventh Circuit held that for purposes of the Eleventh Amendment a Georgia Sheriff functions as an "arm of the state" when he "establish[es] [a] use-of-force policy at the jail" and "train[s] and disciplin[es] his deputies in that regard."  The court limited its holding only to those specific functions, each of which were at issue in that case, and did not purport to "answer . . . whether [defendant sheriff] wears a 'state hat' for any other functions he performs." ***Id.***  at 1328.  Nevertheless, in concluding that the sheriff was an "arm of the State," the court found it significant that a county sheriff's "authority and duty to administer the jail in his jurisdiction flows from the State, not

[the] County." *Id.* at 1315; *see also **Purcell v. Toombs County***, 400 F.3d 1313, 1325 (11th Cir. 2005).

At issue in this case is Sheriff Talton's responsibility for promulgating and administering the intake procedures at the jail.  That responsibility falls squarely within Sheriff Talton's exclusive "authority and duty to administer the jail"—an authority that is delegated to Sheriff Talton by Georgia law, not by Houston County. ***Manders***, 338 F.3d at 1315 (citing ***In re Irvin***, 328 S.E.2d 215 (Ga. 1985)). Consistent with the reasoning of ***Manders***, the Court concludes that Sheriff Talton acts as an "arm of the State" when he promulgates and administers the jail's intake procedures.[13]

---

[13] At this juncture (having determined that Talton is an "arm of the state"), the Court has two options for resolving the official-capacity § 1983 claim against Talton: It can resolve the claim on either statutory or constitutional grounds.  If the latter course is chosen, the Court would be forced to undertake an Eleventh Amendment immunity analysis, which in this particular case would require the Court to determine whether Sheriff Talton waived sovereign immunity on the § 1983 claim by removing this case from state court to federal court, as Bell has argued.  (Pl.'s Opp'n Defs.' Mot. Summ. J., doc. 22, at 7 n.5) ("In this case, to the extent, the Sheriff is considered an arm of the State, the State by and through its attorney consented to being sued in Federal Court in that the Defendants removed this case to Federal Court.")  But that undertaking would be unnecessary because a State is not a "person" and thus cannot be sued for money damages under § 1983 anyway.  *See **Will v. Mich. Dep't of State Police***, 491 U.S. 58, 64 (1989); *see also **Lapides v. Bd. of Regents of Univ. Sys. of Ga.***, 535 U.S. 613 (2002) (declining to address sovereign-immunity waiver argument with respect to plaintiff's § 1983 damage claim against the State because such a claim "d[id] not present a valid federal claim against the State").  That is, with respect to the official-capacity claim against Talton, § 1983 does not permit the cause of action Bell has pleaded.  There is therefore no need to answer the constitutional question whether Talton is entitled to immunity on the facts of this case. The instant case perfectly illustrates why § 1983 claims for money damages against a State, a State official, or an "arm of the State" should always be resolved on statutory rather than constitutional grounds.  *See **Vt. Agency of Natural Res. v. United States ex rel. Stevens***, 529 U.S. 765, 779 (2000)

Bell's due process claim is pursued under § 1983, which imposes civil liability on any "person" who "under color of" state law deprives another person of his federally protected rights.  42 U.S.C.A. § 1983 (West 2003).  In ***Will v. Mich. Dep't of State Police***, 491 U.S. 58, 64 (1989), the Supreme Court held that "a State is not a person within the meaning of § 1983."  The Court in ***Will*** stated that its holding applied not only to States themselves but also to "governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes."  491 U.S. at 70. The Court reasoned that "a suit against a state official in his or her official capacity . . . is no different from a suit against the State itself."  ***Id.*** at 71 (internal citations omitted).

This Court has determined that, under the reasoning of ***Manders***, Talton would be considered an "arm of the State" for purposes of the Eleventh Amendment.  Thus, Bell's official-capacity claim against Talton is in reality a claim against the State of Georgia, which, under the authority of ***Will***, is not a "person" within the meaning of

(stating that "the question whether the statute itself *permits* the cause of action it creates to be asserted against States" is "'logically antecedent to the existence of' the Eleventh Amendment question" and thus it is "indeed appropriate [ ] to decide the statutory issue first.").  Unfortunately, that is not always done, *see **Manders***, 338 F.3d 1304, 1328 n.53 (determining that Georgia sheriff was entitled to sovereign immunity as an "arm of the state," and refusing to resolve the § 1983 claim on the basis of ***Will*** because the "statutory issue [ ] is not before us as it was neither briefed nor argued on appeal"), even in this Court, *see **Najiy-Ullah Aziyz v. Tommy Tremble***, No. 5:03-CV-412 (DF) at 12 n.8 (M.D. Ga. Feb. 9, 2006) (holding that the Georgia Department of Corrections was entitled to sovereign immunity on § 1983 claim, while recognizing ***Will*** as an alternative basis for disposing of plaintiff's § 1983 claims).

§ 1983 and is therefore not subject to suit for an alleged violation of the statute.  *See also* ***Howlett v. Rose***, 496 U.S. 356, 376 (1990) ("Since this Court has construed the word "person" in § 1983 to exclude States [and arms of the State], neither a federal court nor a state court may entertain a § 1983 action against such a defendant.")  Talton in his official capacity is therefore entitled to summary judgment on Bell's § 1983 claim.

### b.    Williams

Williams argues that the official-capacity claim alleged against him should be dismissed as duplicative.  (Defs.' Mot. Summ. J., doc. 14, at 17.)  Williams is correct.  And he is correct regardless of whether he is viewed as representing the State or the county in carrying out his duties as a county jail officer.  Thus, the Court does not decide that question.

Whether Williams is considered an "arm of the state" because of his relationship to the elected sheriff, *see* ***Carr v. City of Florence***, 916 F.2d 1521, 1526 (11th Cir. 1990) (extending Eleventh Amendment immunity to Alabama deputy sheriffs); ***Lancaster v. Monroe County***, 116 F.3d 1419, 1429 (11th Cir. 1997) (extending Eleventh Amendment immunity to Alabama jailers),[14] or whether he is

---

[14] The Eleventh Circuit has never held that Georgia deputy sheriffs or jail officials are "arms of the State" for Eleventh Amendment purposes, but the reasoning underlying ***Carr*** and ***Lancaster***—that deputies and jailers should be viewed as such because the elected sheriff (himself

treated as an agent of the county, the official-capacity claim asserted against him is duplicative since both of the entities that Williams might be said to represent—the State and the county—are already parties to this suit.  The State has been made a defendant by virtue of the official-capacity claim against Talton, and the County was named as a defendant in Bell's complaint.  Accordingly, the Court need not determine whether Williams functions as an agent of Georgia or Houston County in his capacity as a county jail officer.  The official-capacity claim against Williams is dismissed.

### 3. Municipal Liability Against Houston County

A municipality is a "person" for purposes of § 1983 and may be subject to liability under the statute in some circumstances. *Monell*, 436 U.S. 658.  Explaining its holding in *Monell*, the Supreme Court has said that "a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue.  *Respondeat superior* or vicarious liability will not attach under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original). "Thus, only when a 'policy or custom' *of the municipality* inflicts the injury does § 1983 liability exist." *Cook ex rel. Estate of Tessier v. Monroe County*, 402 F.3d

---

an "arm of the state") has the power to hire them, fire them, discipline them, and otherwise control their job duties—would appear to apply with equal force in Georgia, given the Eleventh Circuit's discussion in *Manders* about the relationship between Georgia sheriffs and their deputies.  338 F.3d at 1311.

1092, 1116 (11th Cir. 2005).  So the "first inquiry . . . is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  *City of Canton*, 489 U.S. at 385.

In this case, there is no Houston County policy or custom even arguably at issue.  That is because, under Georgia law, Houston County has no authority to promulgate or administer the jail policy implemented and enforced by Sheriff Talton.  *See Manders*, 338 F.3d at 1310-11.  In other words, Sheriff Talton, in implementing and enforcing the written jail policy governing booking and intake procedures, is not a policymaker for Houston County.  Thus, Houston County is not a proper party to this lawsuit and is entitled to summary judgment on Bell's § 1983 claim.[15]

## B.    State-Law Claims

In addition to his due process claim, Bell has alleged in his complaint state-law claims for: (1) malicious prosecution; (2) false imprisonment; (3) negligent hiring and retention; and (4) intentional infliction of emotional distress.  (Compl. ¶¶ 18-36.)  He also alleges violations of the Georgia Constitution.  (Compl. ¶ 41.)

---

[15] Even if Houston County were a proper party—which it is not—it could not be subject to municipal liability under *Monell* because Bell has not suffered a constitutional deprivation.  *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam); *see also Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996) ("Since we have determined that Deputy Watson's conduct did not cause the Rooneys to suffer a constitutional deprivation, we need not inquire into Volusia County's policy and custom relating to patrol vehicle operation and training.").

The Court's jurisdiction over those claims is supplemental, not original.  *See* 28 U.S.C.A. § 1367(a) (West 2005).  Where, as here, the Court has dismissed all claims over which it has original jurisdiction, it may, in its discretion, remand to state court any remaining pendent state-law claims.  *See* 28 U.S.C.A. § 1367(c)(3); *see also* ***Engelhardt v. Paul Revere Life Ins. Co.***, 139 F.3d 1346, 1350 (11th Cir. 1998) (recognizing district court's discretion to remand state-law claims under § 1367(c)).  That is what the Court will do in this case because remanding the pendent state-law claims will further the principles of judicial economy and comity.  *See* ***In re City of Mobile***, 75 F.3d 605, 607 (11th Cir. 1996).  Accordingly, Bell's state-law claims are hereby remanded to the Superior Court of Houston County.

## IV.  CONCLUSION

Bell's due process claim falls well short of demonstrating a constitutional violation.  Thus Williams is entitled to summary judgment on qualified immunity grounds as to the § 1983 individual-capacity claim against him.  Talton is likewise entitled to summary judgment on the § 1983 individual-capacity claim against him because claims premised on a theory of vicarious liability are not cognizable under § 1983, and Talton played no part in any of the acts of which Bell complains.

Talton is entitled to summary judgment on Bell's official-capacity claim because he is an "arm of the state" for the function at issue in this case and thus is not

a "person" capable of being sued for money damages under § 1983. Williams is entitled to summary judgment on Bell's official-capacity claim because that claim is duplicative of the official-capacity claim against Talton and the claim against Houston County.

Finally, Talton does not act on behalf of Houston County when he establishes and administers the jail policy. Thus Houston County cannot be held liable under *Monell*. Accordingly, Houston County is entitled to summary judgment.

For these reasons, Defendants' motion for summary judgment (doc. 14) is hereby **GRANTED** as to Bell's federal claims; the state-law claims are remanded to the Superior Court of Houston County, Georgia.

SO ORDERED, this 27th day of June, 2006.

**/s/ Duross Fitzpatrick**
DUROSS FITZPATRICK, JUDGE
UNITED STATES DISTRICT COURT

DF/sew

-34-